**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

SETH PRATT,                                          Case No.

    Plaintiff,                                      Hon.

v.

BOARD OF EDUCATION OF ONEKAMA          **JURY TRIAL DEMANDED**
CONSOLIDATED SCHOOLS,


    Defendants.
_____/


**COMPLAINT**


**This Complaint relates to the pending action *Pratt v. Board of Education of Onekama Consolidated Schools,* Case No. 1:24-cv-00728-JMB-PJG (W.D. Mich.) (Hon. Jane M. Beckering)**

Plaintiff Seth Pratt (hereinafter "Plaintiff"), by and through his undersigned counsel,

brings this Complaint against Defendant Board of Education of Onekama Consolidated Schools

("Defendant" or "OCS"), and alleges as follows:

**PRELIMINARY STATEMENT**

1.      This is an action for damages alleging sexual harassment, hostile work

environment and sexual orientation discrimination claims under Title VII of the Civil Rights Act of

1964, 42 U.S.C. §2000e *et seq.* ("Title VII"), and the Michigan Elliott-Larsen Civil Rights Act, M.C.L.

§37.2101, *et seq.* ("ELCRA") [1]

---

[1] The Complaint in Case No. 1:24-cv-00728 ("Pratt I") asserted five causes of action, which have
been reduced to three for trial. On May 5, 2026, the Court in Pratt I issued an Opinion and Order
dismissing Counts III and V of the Pratt I Complaint (ECF No. 1), and dismissing certain
individual Defendants and Defendant Manistee ISD. (ECF No. 69, PageID 3587) The Opinion
and Order further held that "Counts I, II, and IV will proceed to trial in connection with the sole
remaining parties, Pratt and Defendant OCS." Pratt I Opinion and Order, at 37 (ECF No. 69,
PageID 3623). Counts I and II assert claims for interference and retaliation in violation of the

2.      Plaintiff Pratt was employed by Defendant OCS as a K-12 Principal and Academic Counsellor under a three-year written contract with effective dates of July 1, 2023, 2023 through June 30, 2026 (the "Contract"). *See* Administrative Contract Academic Advisor/K-12 Principal, attached as Exhibit 1.

3.      Pursuant to the Contract, Pratt could be terminated only "for a just and reasonable cause after a fair hearing before the Board of Education."  Contract, ¶ 2.

4.      The common facts of this case arise from incidents leading to the termination of Pratt's employment with Defendant OCS on or about July 28, 2023.

5.      Pratt was initially employed by OCS on April 12, 2021.  Due to his good performance, he was rewarded with a new contract effective from January 31, 2022 through June 30, 2023. Pratt was evaluated by then-Superintendent Hagen as Highly Effective for the 2021-22 school year, and was rewarded with the three-year contract attached as Exhibit 1. That all changed with the disruption caused by the termination by OCS of a popular teacher in February 2023 and the arrival of Interim Superintendent Mark Parsons in March of 2023.

6.      Based on information provided in part by Pratt, Superintendent Hagen authorized an investigation of the probationary teacher, Kelly Kelley, which concluded among other things that Kelley violated certain board policies and directives, and that Kelley had not been truthful with the investigator. Based on these conclusions, Hagen recommended to the OCS board that Kelley be terminated.

7.      Hagen retired from Onekama near the end of 2022. She was replaced by temporary interim Superintendent Kim Blaszak.

---

Family and Medical Leave Act ("FMLA"), 29 U.S.C. 2601, *et seq.* Count IV asserts a claim for breach of Pratt's employment contract.

8.      Kelley had served as an officer with the OCS teacher's union, and was well known in the community. She mounted a defense to the termination recommendation based largely on attacking Pratt, even accusing him of sexual harassment. Although an investigation of that allegation had been conducted by OCS and found to be without support, Kelley and her supporters continued to reallege and expand their allegations against Pratt as Kelley's termination proceeding continued.[2]

9.      A hearing was held on February 20, 2023, at which the OCS board determined to terminate Kelley's employment with OCS.[3] That hearing lasted until well after 1:00 a.m. and included hours of public comment by supporters of Kelley which attacked Pratt and repeated the false sexual harassment and worse allegations made by Kelley.

10.      Parsons replaced Blaszak as interim Superintendent on or about March 3, 2023. Despite Pratt's Highly Effective evaluation, and being cleared of the sexual harassment allegations after an investigation, Parsons decided that the community would not accept Pratt as a perceived homosexual male, and engaged in a plan to terminate Pratt due to his perceived sexual orientation.

11.      Parsons used the orchestrated public outrage caused by the Kelley firing and false sexual harassment and related allegations to engage in actions intended to create an employment environment so hostile that Pratt would quit his employment. This included a conversation in March 2023, just days after he became interim Superintendent, in which Parsons conveyed to

---

[2] Due to the ongoing effects of Kelley's false allegations of sexual harassment and other allegations against him, Pratt was compelled to file a defamation lawsuit against Kelley and others in the case *Pratt v. Kelley, et al.,* Case No. 23-23-699-CZ (Ingham County, Michigan Circuit Court). That action remains pending.

[3] Kelley subsequently filed a lawsuit challenging her termination in the case *Kelly Kelley v. Onekama Consolidated Schools, et al.,* Case No. 1:23-cv-00270 (W.D. Mich.) (Hon. Paul L. Maloney). That case was subsequently dismissed.

Pratt that he would never be accepted in the Onekama community because he was perceived as homosexual, and if he agreed to quit, Pratt would leave with his previous positive evaluations, and even a letter of recommendation from Parsons, and could find another job. But, if he did not quit, in a year he would face a negative evaluation, no letter of recommendation, a non-renewed contract, and implied that this would make it difficult for Pratt to find subsequent employment. Pratt's office was moved to a former storage room, and Parsons took certain equipment and a chair from Pratt's old office for his own use, while failing to replace those items. This made it impossible for Pratt to successfully do his job.

12. The hostile work environment eventually caused Pratt's health to deteriorate to the point where he was forced to take leave under the Family and Medical Leave Act ("FMLA") on May 11, 2023.  Pratt's FMLA paperwork was drafted by his therapist and identified a hostile work environment as a basis for the application.

13. Pratt did not request that OCS perform an investigation of the hostile work environment statement in his FMLA paperwork, but OCS on its own, decided to conduct an investigation, despite the lack of any formal complaint. On May 15, 2023, OCS hired an individual named Allen Telgenhof to perform the investigation. Because there was no complaint, Telgenhof requested that Pratt provide him with allegations to investigate. Pratt did so.

14. Telgenhof made the same request of Parsons, who initially responded that he did not have any complaint against Pratt. However, Parsons subsequently realized that this was an opportunity to bring allegations against Pratt and make his March 2023 threat a reality. He provided a series of emails and other documents from which Telgenhof inappropriately created a complaint on behalf of OCS.

4

15.    Telgenhof then investigated the complaint he created from the Parsons documents, ignored or discounted information provided by Pratt and witnesses favorable to Pratt, failed to recognize the clear intent of Parsons' threats made to Pratt in March 2023, improperly made credibility determinations almost uniformly against Pratt based on little to no objective evidence, and used those unsupported credibility determinations to make findings adverse to Pratt on nearly every material issue, and to make findings favorable to OCS, which had retained him, on nearly every material issue.

16.    Telgenhof issued a report on June 23, 2023 which was not fair, objective, or supported by the evidence.

17.    Parsons then, on July 17, 2023 issued Written Notice of Charges to the Board of Education which included 3 charges based on the flawed Telgenhof Report. Parsons recommended termination.

18.    Nearly all of the significant charges improperly related to events which occurred after Pratt was already on FMLA leave.

19.    The charges which were based on facts occurring prior to Pratt's FMLA leave did not constitute "just cause" for termination as required for such action under the Contract.

20.    A hearing before the OCS Board of Education took place on July 28, 2023 at which the OCS Board considered the charges. OCS and Parsons did not bring a representative attorney to the hearing. Instead, at the hearing Telgenhof, the ostensible independent investigator, improperly advocated for the charges brought by Parsons and acted as the representative for Parson's recommendation to terminate Pratt's employment.

21.    Following the hearing, the OCS Board of Education voted to approve a resolution terminating Pratt's employment, relying upon Telgenhof's unsupported findings. Although not

5

stated in the Resolution, presumably the Board improperly concluded the Parsons charges

constituted the just cause required to terminate Pratt's written contract.

22.    This termination process was the culmination of Parsons' and the OCS Board's

desire to force Pratt out of his employment based on his perceived sexual orientation, and to

divert and alleviate public outrage caused by the Kelley termination and the false allegations

made against Pratt during that process, which upon information and belief were motivated by

Pratt's perceived sexual orientation.

23.    After his termination, Pratt attempted to apply for substitute teaching positions.

Pratt maintains a valid teacher certification by the State of Michigan.

24.    Upon information and belief, the Manistee Intermediate School District

("Manistee ISD") provides human relations services to OCS.  These services include the

processing of applications for substitute teacher work.

25.    Pratt applied for a substitute teaching position through the Manistee ISD in

approximately May 2024.

26.    Pratt was denied the ability to substitute teach in all districts and academies

served by the Manistee ISD, including OCS.

**PARTIES, JURISDICTION AND VENUE**

27.    Plaintiff Seth Pratt is a resident of Manistee County, Michigan, located the

Western District of Michigan.

28.    Defendant OCS is a public education institution located Manistee County,

Michigan, in the Western District of Michigan.

29.    Jurisdiction is proper in this Court because the Complaint asserts a federal

question pursuant to 28 U.S.C. 1331, based on violation of Title VII of the Civil Rights Act of

1964, 42 USC §2000e *et seq*. The Court has supplemental and pendant jurisdiction over the state law cause of action under 28 U.S.C. §1367 because the state law claim is so related that it forms part of the same case or controversy and is logically interdependent with the federal claims. 28 U.S.C. §1367.

30.     Venue is proper in this District pursuant to 28 U.S.C. 1391(b)(1) because Defendant is located in the Western District of Michigan and has its principal places of business located in the State of Michigan. Venue is also proper under 28 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

31.     Plaintiff Seth Pratt was, until July 28, 2023, employed by Defendant OCS as K-12 Principal and as Academic Counselor. In those capacities, he was given multiple responsibilities including, but not limited to, the development of a summer school process, oversight of testing and curriculum decisions, the management of school safety measures, and coordination of employee roles and responsibilities.

32.     During the course of his employment, Pratt was subjected to a hostile work environment and discriminated against, and ultimately terminated based on his perceived sexual orientation by his supervisor, Mark Parsons, then-interim Superintendent of OCS, and the Board of Education of OCS.

33.     OCS was in the midst of a leadership crisis, which provided cover Parson's and OCS's discriminatory actions and harassment for which Mr. Pratt was made a convenient scapegoat because of his perceived sexual orientation and stereotyping.

34.     Parsons was the third superintendent at OCS in less than a year. OCS's Board President abruptly resigned after the public hearing on February 20, 2023, related to the termination of probationary teacher Kelly Kelley.

35.     Following that hearing Parsons, with the support or acquiescence of the Board, engaged in actions to make working conditions for Pratt unbearable in an attempt to force him to quit his employment.

36.     Kelly Kelley was a probationary teacher with OCS from approximately 2018 until February 20, 2023. Mr. Pratt, in his role as Principal, was her supervisor.

37.     The Village of Onekama is a small community, and Kelly Kelley is a long-time nearby resident, with many supporters, personal friends and family in the area.

38.     Pratt became aware of significant problems with Kelly Kelley's job performance, and brought those concerns to then-superintendent Gina Hagen. Hagen ultimately recommended to OCS that Kelly Kelley be terminated.

39.     Kelly Kelley became aware that Pratt was dissatisfied with her performance, and came up with a pretext in an attempt to prevent her expected dismissal. On October 28, 2022, Kelly Kelley's husband Shawn Kelley filed a complaint with Superintendent Hagen against Pratt alleging sexual harassment, asserting that Pratt took a photo of Kelly Kelley on a treadmill in an area open to students and staff at the school. Pratt denied the allegation, but an investigation was conducted nonetheless. An independent investigator did a thorough investigation, interviewed multiple witnesses, and ultimately issued a report finding no basis for Kelley's complaint.

40.     Kelly Kelley and Shawn Kelley continued to publish and disseminate statements that Pratt was a sexual harasser and used other terms which conveyed to members of the OCS

community that Pratt was a "sexual predator" or "sexual harasser" or "sexual offender," all of which terms were used in the community thereafter.

41.    On November 28, 2022, at the recommendation of then-Superintendent Hagen, the OCS Board retained the Thrun law firm to investigate complaints against Kelly Kelley by parents, staff, and students concerning her conduct in the classroom, and Hagen and Pratt's concerns regarding her effectiveness in her instructional responsibilities.

42.    On December 28, 2022, the investigator issued a report concluding that Kelly Kelley had violated multiple board policies. The report referenced Pratt and Kelly Kelley as having an adversarial relationship, and Pratt was identified by many Kelly Kelley supporters as the person most responsible for causing the investigation to be started.

43.    Superintendent Hagen recommended that Kelly Kelley be terminated as a probationary employee, and OCS scheduled a special meeting for February 20, 2023 to conduct a hearing to determine whether discipline should be imposed based on the Thrun report and recommendation.

44.    Shortly after the investigation concluded, Pratt and Hagen began receiving negative and threatening messages from community members, some of whom accused Pratt of being a sexual predator and some used various epithets negatively referring to Pratt as a homosexual. These comments were made during public comments at board meetings, and directly to Pratt and Hagen.

45.    These threatening messages and comments made Pratt feel unsafe in his work environment.

46.    The OCS Board did nothing to address Pratt's safety and well-being concerns.  It did not issue any statements supportive of Pratt, nor did it take any action to ensure his safety.

47. Upon information and belief, as a result of the threats and hostile work environment caused by the Board's failure to take any action, Superintendent Hagen resigned prior to the February 20, 2023 special meeting. Hagen was replaced by temporary interim Superintendent Kim Blaszak.

48. On February 20, 2023, the hearing to determine whether to discipline Kelly Kelley took place over approximately 8 hours, ending well after 1:00 a.m. in the morning. Interim Superintendent Kim Blaszak made the same recommendation for termination at the hearing that former Superintendent Hagen had made. Pratt was also asked if he agreed with the recommendation to terminate Kelly Kelley, and he responded that he did.

49. There were many hours of public comment, and comments outside the meeting room, much of which was negatively directed toward Pratt, who was referred to as a sexual predator, and sexual offender, or words to that effect on multiple occasions.

50. The OCS Board did nothing to attempt to curb these statements, despite the fact that an investigator had already found there was no basis for the allegations against Pratt, and the hostile work environment they created.

51. At the conclusion of the February 20, 2023 special meeting, the Board voted to terminate Kelly Kelley's employment. More negative comments toward Pratt occurred in the final public comment session before adjournment which were based on or influenced by the false allegations against Pratt and his perceived homosexuality.

52. Shortly after the February 20, 2023 Board meeting, Board President Lori Gildersleeve abruptly resigned from the Board, upon information and belief, due to the negative public comment and reaction to the Board's vote to terminate Kelley.

53.     Within days after the February 20, 2023 special meeting, Hagen's replacement, interim Superintendent Kim Blaszak, also left her employment with OCS. She was replaced by interim Superintendent Mark Parsons in March.

54.     In the days following the February 20, 2023 special meeting, there was substantial public outrage from supporters of Kelly Kelley, and those influenced by the defamatory statements directed toward Pratt. Pratt was subjected to threats by supporters of Kelly Kelley, the back door to his home was forced open one night, and he was called a sexual predator and sexual harasser by students in the school hallways and by students supporting or influenced by Kelly Kelley.

55.     Pratt requested that the Administration and Board implement a safety plan for him, and make an effort to support his ability to do his job with staff and students. The Board and Administration did not adopt a safety plan. No supporting statement was issued, and no action was taken to prevent Pratt from being assailed by staff and students within the building, or in the community.

56.     Instead, interim Superintendent Parsons, with the tacit or actual approval of the Board, planned to use the public's perception of Pratt as a homosexual man and the perceived instigator of the Kelly Kelley termination, to create a hostile work environment and force him to resign to deflect community anger away from the Board and Administration.

57.     Interim Superintendent Parsons decided to permanently move Pratt's workspace from his former Principal's office to a room formerly used as a storage room, with a student table and plastic student chairs. That had been a temporary move.

58.     A computer monitor from Pratt's Principal's office was taken by Parsons. Pratt's office chair from his Principal's office was taken by Parsons. Parsons himself directed Pratt to roll the chair down the hall to Parsons' office as a further act of humiliation.

59.     An individual named Charlie Schwartz, who was not a homosexual, was hired to act as a pre-replacement Principal. Schwartz acted as Principal, often countering Pratt's directives to staff and generally confusing the operation of the building.

60.     Schwartz was hired in a transparent attempt to undermine Pratt's authority, to humiliate him into resigning, and to ensure a replacement was available once Pratt was forced to resign or was terminated. Schwartz was in fact hired as sole Principal after Pratt was terminated.

61.     On March 13, 2023, Parsons met with Pratt. During that meeting, Parsons implied and effectively communicated to Pratt that he would never be accepted in a conservative community like Onekama as a perceived homosexual man. Parsons suggested that he should resign now while he had good evaluations and even offered to write him a positive letter of recommendation to induce Pratt to quit voluntarily. However, said Parsons, if Pratt tried to stay, in another year he would have an unfavorable evaluation, faced non-renewal of his employment contract, and no letter of recommendation, all of which would make it harder to find another job. Parsons even related the experience of his son's partner, who was allegedly a school administrator in a conservative area in Colorado and was reportedly never accepted by the community because of his homosexuality, no matter how hard he tried to succeed, suggesting it would be the same for Pratt.

62.     Pratt reasonably understood Parsons' comments to be a threat by his immediate supervisor to force him to resign now, or receive an unfavorable evaluation and be forced out later.

12

63.     Following this meeting, Pratt unsuccessfully attempted to negotiate a buyout of his contract with OCS. Pratt and OCS had signed a three-year contract extension in January 2023, which was to begin on July 1, 2023, and extend through June 30, 2026.

64.     After the unsuccessful buyout negotiation, Parsons, together with Schwartz, and with the Board's tacit approval, redirected their efforts to get Pratt to resign or force him out by other means.

65.     The continuing harassment, pressure to resign, lack of support and discrimination eventually took a toll on Pratt's health. Due to the intolerable and hostile working conditions created by the Board and Parsons, Pratt went on leave under the Family Medical Leave Act ("FMLA") on May 11, 2023.

66.     Pratt's therapist, Michele Ganss, completed the FMLA request for leave paperwork for him. In that request for leave, Ms. Ganss stated that the reason for the leave was that Parsons and the District had created a hostile work environment. This conclusion was based on her work as a professional therapist with Pratt.

67.     In the time prior to going on FMLA leave, Pratt was subjected to constant unwarranted criticism and belittlement.

68.     Throughout the course of these events, Parsons demonstrated a pattern of changing communication expectations, making arbitrary decisions, disregarding Pratt's professional capabilities and contributions, and undermining Pratt's authority and credibility, all in an effort to achieve the goal stated by Parsons in the March 13 meeting of forcing Pratt to resign due to his perceived homosexuality.

69.     Parsons' actions and behavior created a hostile work environment, resulting in unfair treatment and discrimination against Pratt, in violation of Title VII of the Civil Rights Act and the Elliott-Larsen Civil Rights Act.[4]

70.     Pratt went on FMLA leave, effective May 11, 2023.

71.     On May 15, 2023, OCS started an investigation against Parsons ostensibly into the assertion of discrimination and creation of a hostile work environment in Pratt's FMLA paperwork.  Pratt did not request the investigation, and it soon became clear that his FMLA request was not the real reason for the investigation.  It was instead intended to find a pretextual basis to commence termination proceedings against Pratt as a result of his perceived homosexuality.

72.     OCS hired Telgenhof to conduct the investigation.

73.     Initially, Parsons admitted to the investigator that he did not have a complaint to make against Pratt.

74.     However, on May 26, 2023, just before Pratt was scheduled to be interviewed by the investigator regarding the discrimination and hostile work environment claims against Parsons and OCS, Parsons suddenly notified the investigator that he had claims against Pratt that the district wanted investigated in the same proceeding.

75.     The investigator had previously confirmed that the only allegations he was investigating were the claims by Pratt against Parsons. The late-received Parsons allegations made clear the real purpose of the investigation was to focus on Pratt.

---

[4] Plaintiff filed a Charge with the EEOC and "MDCR" on or about January 30, 2024, which was assigned MDCR # 639183, and EEOC # 23A-2024-00417 (Ex. 2). EEOC issued a Right to Sue Letter on March 26, 2026 (Ex. 3).

76.     OCS, through Parsons, sent the investigator 47 pages of scattershot emails and other documents concerning Pratt's performance, almost all of which were mundane task-related complaints which Pratt addressed during the investigation, or related to events occurring after Pratt was already on FMLA leave.

77.     Parsons did not submit a formal complaint against Pratt. Instead, contrary to his role as an independent fact-finder, Telgenhof took it upon himself to create a complaint to investigate from the unorganized materials provided by Parsons.

78.     The real purpose of the investigation was to find something, anything that OCS could use as a pretext to start a termination proceeding against Pratt. This purpose is made clear in the first page of the materials provided to the investigator by Parsons. That page was an anonymous letter to the Board, which should have received no credibility, that accused Pratt, without referencing a single event in support, of being a divisive leader, and not interested in leading by example or building consensus. The anonymous letter went on to demand that the Board dismiss Pratt or the writer would remove their children from the school: "The continued employment of Mr. Pratt will be a barometer for our decision."

79.     Rather than dismiss the anonymous letter, Parsons included it as the very first page of the scattershot materials against Pratt.  This shows the real intent of the Board and Parsons in commencing the investigation was to find any pretextual basis to terminate Pratt, a perceived homosexual man in a conservative district, just as Parsons had foretold back in March 2023, who could be scapegoated by OCS and the Administration and be used to deflect all community outrage over the Kelley termination to him, and then terminate Pratt to eliminate the problem.

80.    The investigation changed course significantly after the Parson's materials were provided to Telgenhof.  It now focused on Pratt's performance of the minutiae of the Principal's job, despite the fact that most of the allegations were not of a nature that would ordinarily be subject to a formal investigation, and certainly did not rise to the level of "just cause" for termination.  Many other allegations were improperly based on events that occurred after Pratt was on FMLA leave on May 11, 2023, including a National Honor Society ceremony that occurred after May 11, 2023, and teacher evaluations that historically had been done on the last day of school in June.

81.    The pretextual nature of the investigation was also made clear by the fact that on June 5, 2023, before the investigation was even completed, OCS hired a replacement for Pratt's academic counsellor position.  The person hired was the spouse of one of the Board Members. This meant that OCS had hired replacements for both Pratt's Principal position and his academic counsellor position before the investigation was finished.  The result of the investigation was essentially pre-determined.

82.    The actions of Defendant OCS and Parsons, including the conduct of the sham investigation and termination hearing, were motivated by discriminatory intent due to Pratt's perceived homosexuality.

83.    Parsons repeatedly criticized Pratt's actions and decisions, despite Pratt following past common practices and protocol. Parsons' inconsistency in providing directives, and his subsequent dissatisfaction when Pratt complied with these directives, further aggravated the hostile work environment, and were intended to further Parson's plan to force Pratt to resign due to his perceived homosexuality.

84.     Parsons' arbitrary decisions and continuous criticism of Pratt's professional judgment were intended to undermined Pratt's authority and credibility with staff making it impossible for Pratt to perform his job, and created a hostile work environment that caused the deterioration of Pratt's health and lead to his FMLA leave request.

85.     Parsons has repeatedly accused Pratt of insubordination, despite Pratt's compliance with all directives and responsibilities prior to going on FMLA leave. These baseless accusations were intended to undermine Pratt's credibility and professional reputation, thus causing emotional distress and mental anguish in order to force him to resign.

86.     Despite these ongoing incidents and hostility, Pratt has consistently upheld his professional responsibilities, received positive evaluations, and was not subjected to formal disciplinary measures or written reprimands, prior to going on FMLA leave in May 2023.

87.     Despite being subjected to unlawful discrimination, retaliation, and a hostile work environment, Pratt has demonstrated resilience, commitment, and dedication to his professional duties. However, the continuous adverse actions by Parsons and OCS, including Pratt's termination for alleged unprofessional conduct, have caused significant harm to Pratt's professional reputation, career prospects, and emotional wellbeing.

88.     As a direct and proximate result of Defendant's unlawful actions, Pratt has suffered and continues to suffer emotional distress, humiliation, embarrassment, mental and emotional pain and suffering, loss of enjoyment of life, and other severe and serious damages.

89.     As a result of the actions of Defendant and its agent Parsons, Pratt has been unable to obtain employment in the field of education as a result of the unlawful termination proceeding to which he was subjected.

**COUNT I – DISCRIMINATION BASED ON SEXUAL ORIENTATION (TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e et seq.)**

90.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

91.     Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and Michigan Department of Civil Rights ("MDCR") against Defendant OCS alleging discrimination in violation of Title VII and the ELCRA. *See* Ex. 2.

92.     Because Michigan is a "deferral jurisdiction," the investigation was handled by the MDCR. *See Logan v. MGM Grand Detroit Casino,* 939 F.3d 824 (6th Cir. 2019). MDCR investigated Plaintiff's Charge.

93.     On March 26, 2026, the EEOC issued a Notice of Right-To-Sue concerning Plaintiff's claims of discrimination and hostile work environment based upon sexual orientation. *See* Ex. 3.

94.     Plaintiff's receipt of the Notice of Right-To-Sue Letter was a prerequisite to filing Plaintiff's Title VII claims, which has now been satisfied.

95.     This action is brought within ninety (90) days after Plaintiff's receipt of the Notice of Right-To-Sue Letter.

96.     At all relevant times, Defendant was an employer within the meaning of Title VII of the Civil Rights Act of 1964. 42 U.S.C. §2000e(b).

97.     Plaintiff is a member of a protected class under Title VII because he was perceived by Defendant and its agents to be homosexual and non-gender conforming.

98.     Title VII makes it unlawful for an employer to discharge or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or

18

privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. §2000e-2(a).

99.    This prohibition includes discrimination against or discharge of an employee because of sexual orientation. *See Bostock v. Clayton County*, 590 U.S. 644, 140 S.Ct. 1731 (2020).

100.    OCS and its agent Parsons unlawfully discriminated against Pratt and terminated his employment because of his sex, including specifically his sexual orientation. 42 U.S.C. §2000e-2(a); 42 U.S.C. §2000e-2(m).

101.    Parsons repeatedly referenced Plaintiff's perceived homosexuality and conveyed to Plaintiff that he would never be accepted within the community because he was perceived to be homosexual.

102.    During the meeting in March 2023, Parsons urged Plaintiff to resign and communicated that if Plaintiff did not resign, Defendant would ensure that he received negative evaluations, non-renewal of his employment contract, no recommendation regarding future employment, and ultimately the loss of his employment.

103.    With the intent to encourage or force Plaintiff to resign his employment, during the March 2023 meeting Parsons compared Plaintiff's situation to that of another allegedly homosexual school administrator who purportedly was never accepted by his conservative community because of his sexual orientation.

104.    Parson's actions were motivated by Plaintiff's actual or perceived sexual orientation and by community hostility toward Plaintiff based upon stereotypes concerning homosexuality and gender non-conformity.

19

105.    Defendant subjected Pratt to different terms and conditions of employment than similarly situated employees who were not perceived to be homosexual, specifically Charlie Schwartz, who was hired as principal while Pratt was still employed as Principal, and who was hired as Principal for the school year following Pratt's termination.

106.    Defendant created and permitted a hostile work environment based upon Pratt's actual or perceived sexual orientation with the intent of encouraging or forcing Pratt to resign his employment.

107.    Defendant failed to take reasonable corrective action to address the hostile work environment and discriminatory treatment directed toward Pratt.

108.    Defendant ultimately terminated Plaintiff's employment because of, or motivated in part by, Pratt's actual or perceived sexual orientation or gender non-conformity.

109.    Defendant's stated reasons for its actions were pretextual and were used to conceal unlawful discrimination.

110.    As a direct and proximate result of Defendant's unlawful conduct, Pratt has suffered lost wages, lost benefits, loss of future earning capacity, emotional distress, humiliation, embarrassment, mental anguish, reputational harm, and other compensatory damages.

111.    Defendant acted intentionally, willfully, maliciously, and/or with reckless indifference to Pratt's federally protected rights.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant and award:

A. Back pay and lost employment benefits;

B. Front pay or reinstatement, as appropriate;

C. Compensatory damages for emotional distress, humiliation, embarrassment, and mental anguish;

D. Punitive damages as permitted by law;

E. Prejudgment and post-judgment interest;

F. Costs, expenses, and reasonable attorney fees pursuant to 42 U.S.C. § 2000e-5(k);

G. Declaratory and injunctive relief as appropriate; and

H. Such other and further relief as the Court deems just and proper.

**COUNT II – HOSTILE WORK ENVIRONMENT BASED ON SEXUAL ORIENTATION**
**(TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e et seq.)**

112.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

113.    Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and Michigan Department of Civil Rights ("MDCR") against Defendant OCS alleging a hostile working environment and discrimination in violation of Title VII and the ELCRA. *See* Ex. 2.

114.    Because Michigan is a "deferral jurisdiction," the investigation was handled by the MDCR. *See Logan v. MGM Grand Detroit Casino,* 939 F.3d 824 (6th Cir. 2019). MDCR investigated Plaintiff's Charge.

115.    On March 26, 2026, the EEOC issued a Notice of Right-To-Sue concerning Plaintiff's claim of hostile work environment based upon sexual orientation. *See* Ex. 3.

116.    Plaintiff's receipt of the Notice of Right-To-Sue Letter was a prerequisite to filing Plaintiff's Title VII claims, which has now been satisfied.

21

117.    This action is brought within ninety (90) days after Plaintiff's receipt of the Notice of Right-To-Sue Letter.

118.    At all relevant times, Defendant was an employer within the meaning of Title VII of the Civil Rights Act of 1964. 42 U.S.C. §2000e(b).

119.    Plaintiff is a member of a protected class under Title VII because he was perceived by Defendant and its agents to be homosexual and non-gender conforming.

120.    Title VII makes it unlawful for an employer to discharge or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. §2000e-2(a).

121.    This prohibition includes the creation of a hostile work environment leading to discharge of an employee because of sexual orientation. *See Bostock v. Clayton County*, 590 U.S. 644, 140 S.Ct. 1731 (2020).

122.    OCS and supervisor Parsons unlawfully created a hostile work environment and terminated Pratt's employment because of his sex, including specifically his sexual orientation. 42 U.S.C. §2000e-2(a); 42 U.S.C. §2000e-2(m).

123.    The harassment was based on Pratt's protected characteristic, and was severe and pervasive.

124.    Parsons repeatedly referenced Plaintiff's perceived homosexuality and conveyed to Plaintiff that he would never be accepted within the community because he was perceived to be homosexual. This harassment went to the essence of Pratt's employment and was intended to encourage and force Pratt to resign on threat of non-renewal and termination if he did not quit his employment.

22

125.    During the meeting in March 2023, Parsons urged Plaintiff to resign and communicated that if Plaintiff did not resign, Defendant would ensure that he received negative evaluations, non-renewal of his employment contract, no recommendation regarding future employment, and ultimately the loss of his employment.

126.    With the intent to encourage and force Plaintiff to resign his employment, during the March 2023 meeting Parsons compared Plaintiff's situation to that of another allegedly homosexual school administrator who purportedly was never accepted by his conservative community because of his sexual orientation.

127.    Parson's actions were motivated by Plaintiff's actual or perceived sexual orientation and by community hostility toward Plaintiff based upon stereotypes concerning homosexuality and gender non-conformity.

128.    Defendant created and permitted a hostile work environment based upon Pratt's actual or perceived sexual orientation with the intent of encouraging or forcing Pratt to resign his employment.

129.    Defendant failed to take reasonable corrective action to address the hostile work environment and discriminatory treatment directed toward Pratt.

130.    Defendant ultimately terminated Plaintiff's employment because of, or motivated in part by, Pratt's actual or perceived sexual orientation or gender non-conformity.

131.    Defendant's stated reasons for its actions were pretextual and were used to conceal unlawful discrimination.

132.    As a direct and proximate result of Defendant's unlawful conduct, Pratt has suffered lost wages, lost benefits, loss of future earning capacity, emotional distress, humiliation, embarrassment, mental anguish, reputational harm, and other compensatory damages.

133.    Defendant acted intentionally, willfully, maliciously, and/or with reckless indifference to Pratt's federally protected rights.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant and award:

A. Back pay and lost employment benefits;

B. Front pay or reinstatement, as appropriate;

C. Compensatory damages for emotional distress, humiliation, embarrassment, and mental anguish;

D. Punitive damages as permitted by law;

E. Prejudgment and post-judgment interest;

F. Costs, expenses, and reasonable attorney fees pursuant to 42 U.S.C. § 2000e-5(k);

G. Declaratory and injunctive relief as appropriate; and

H. Such other and further relief as the Court deems just and proper.

## COUNT III – DISCRIMINATION BASED ON SEXUAL ORIENTATION (MICHIGAN ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL 37.2101 et seq.)

134.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

135.    At all relevant times, Defendant was an employer within the meaning of the Elliott-Larsen Civil Rights Act ("ELCRA"), MCL 37.2201 et seq.

136.    Plaintiff is a member of a protected class under ELCRA because he was subjected to discrimination based upon his actual or perceived sexual orientation, gender identity and gender expression.

24

137.    ELCRA prohibits an employer from failing or refusing to hire, recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment because of religion, race, color, national origin, age, sex, sexual orientation, gender identity or expression, height, weight, familial status, or marital status.

138.    Defendant, acting through its agents and employees, including Interim Superintendent Parsons, discriminated against Plaintiff and created a hostile work environment based on Pratt's actual or perceived sexual orientation, gender identity and gender expression.

139.    Parsons informed Plaintiff that he would never be accepted in the community because he was perceived as homosexual and encouraged Plaintiff to resign because of that perception by threatening termination.

140.    Defendant, through Parsons and others acting on its behalf, subjected Plaintiff to unequal treatment, hostility, harassment, humiliation, and adverse employment actions including termination because of his actual or perceived sexual orientation, gender identity and gender expression.

141.    Defendant intentionally created, permitted, or failed to correct a hostile work environment based upon Plaintiff's actual or perceived sexual orientation, gender identity and gender expression.

142.    Defendant further discriminated against Plaintiff by:

   a.    Undermining Plaintiff's authority and professional standing;

   b.    Subjecting Plaintiff to disparate treatment compared with Schwartz, who was not perceived to be homosexual;

   c.    Pressuring Plaintiff to resign;

  d.  Conducting a pretextual investigation;

  e.  Terminating Plaintiff's employment based on pretextual grounds; and

  f.  Interfering with Plaintiff's future employment opportunities.

143. Defendant's asserted reasons for its actions were not the true reasons for the adverse treatment and were instead a pretext for unlawful discrimination.

144. Defendant's conduct was intentional, willful, malicious, reckless, and in conscious disregard of Plaintiff's statutory rights.

145. As a direct and proximate result of Defendant's violations of ELCRA, Pratt has suffered lost wages, lost benefits, loss of future earning capacity, emotional distress, humiliation, embarrassment, mental anguish, injury to reputation, and other economic and non-economic damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant OCS and award:

A. Back pay, lost benefits, and other economic damages;

B. Front pay and/or reinstatement, as appropriate;

C. Compensatory damages for emotional distress, humiliation, embarrassment, and mental anguish;

D. Exemplary damages as permitted under Michigan law;

E. Interest, costs, and reasonable attorney fees as permitted by law;

F. Declaratory and equitable relief as appropriate; and

G. Such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: June 24, 2026                              _/s/ Jeffrey S. Theuer_____
                                                              Jeffrey S. Theuer (P44161)
                                                              Foster, Swift, Collins & Smith, P.C.
                                                              Attorneys for Plaintiff
                                                              313 S. Washington Square
                                                              Lansing, MI  48933
                                                              (517) 371-8100
                                                              jtheuer@fosterswift.com

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a trial by jury on all issues so triable.

Respectfully submitted,

Dated:  June 24, 2026                            ___/s/ Jeffrey S. Theuer_____
                                                              Jeffrey S. Theuer (P44161)
                                                              Foster, Swift, Collins & Smith, P.C.
                                                              Attorneys for Plaintiff
                                                              313 S. Washington Square
                                                              Lansing, MI  48933
                                                              (517) 371-8100
                                                              jtheuer@fosterswift.com